ROSBIA CHARLES ELLIOTT ET AL. *v.* JAMESTOWN
MUTUAL INSURANCE COMPANY ET AL.

[No. 828, September Term, 1974.]

*Decided July 24, 1975.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*Joseph Y. Brattan,* with whom were *Arnold, Beauchemin & Huber, P.A.,* on the brief, for appellants.

*Robert E. Powell,* with whom were *Richard D. Bennett* and *Smith, Somerville & Case* on the brief, for appellee Jamestown Mutual Insurance Company, and *William R. Hymes* for the Unsatisfied Claim and Judgment Fund, other appellee.

MORTON, J., delivered the opinion of the Court. LOWE, J., concurs and dissents and filed a concurring and dissenting opinion at page 575 *infra.*

Jamestown Mutual Insurance Company, pursuant to Md. Code, Art. 31A, filed a declaratory judgment action against its insured, Henry J. Getson, and against Rosbia and Georgia Elliott to determine the question of coverage under an automobile liability insurance policy issued by the company to Getson, against whom the Elliotts had brought suit as a result of an incident occurring on December 29, 1969, in Hagerstown, Maryland. During the pendency of the action, the Elliotts moved to implead the Unsatisfied Claim and Judgment Fund[1] on the basis that Getson would be an uninsured motorist if Jamestown Mutual prevailed in its contention that the policy did not cover intentional wrongs perpetrated by its insured, Getson. The motion to implead was granted by Judge Irvine H. Rutledge, sitting in the Circuit Court for Washington County. After a full hearing on June 25, 1974, he found that neither Jamestown Mutual nor the Fund was liable to the Elliotts for injuries arising out of the incident.

Aggrieved by the finding of no coverage, the Elliotts appealed to this Court, contending:

"The trial court erred in its ruling that the

---

1. Now known as the Maryland Automobile Insurance Fund. Md. Code, Art. 48A § 243 et seq.

Unsatisfied Claim and Judgment Fund would not be required to pay any judgments entered against a motorist whose insurer disclaimed coverage based on a policy exclusion against intentional acts and who assaulted an insured operator following a collision between their respective vehicles, when there is no statutory exclusion for an intentional act under the Unsatisfied Claim and Judgment Fund Law."

The facts which give rise to the Elliotts' claim against Getson are not in serious dispute. According to Rosbia Elliott, on the evening of December 29, 1969, he picked up his wife and young daughter at a store outside of Hagerstown and proceeded west on Route 40 to its intersection with Cleveland Avenue. He stopped in a line of traffic for a red light and when the light turned green he made a left turn onto Cleveland Avenue, following the car in front of him, which he subsequently learned was operated by Henry Getson.

While proceeding in front of Elliott on Cleveland Avenue, Getson activated his right turn signal and pulled to the right as if to enter the area of a motel parking lot. Instead of proceeding into the parking lot, however, he pulled back to his left into the moving line of traffic. Getson continued on Cleveland Avenue until he reached the area of a "fast food" restaurant where he again turned on his right turn signal and pulled off "kind of on the shoulder of the road." Elliott then passed him and after having traveled approximately 300 feet, felt a "bump" to the back of his car. He pulled over and stopped. Getson pulled around him and stopped in front of Elliott's car, in a position to block its passage. Getson then got out of his car, walked back to Elliott's car and said to Elliott: "[N]o son-of-a-bitch can run me off the road and get by with it." Getson reached into Elliott's car, put his arm around Elliott's neck and attempted to pull him from the car. He also grabbed Elliott's left leg and, according to Elliott, he "held my toe and heel and twisted it, and brought my leg around and beat it on the side of the car." Elliott

stated that the injuries he sustained were not a result of the rear-end collision but were occasioned by Getson's attack upon him. He received injuries to his neck and left leg which required three operations and he has been unable to work since the assault.

Getson testified that he had driven his car with five passengers back to Hagerstown from Washington, D. C., where he was doing construction work. He was proceeding west on Route 40 and when he reached Cleveland Avenue, he stopped in the left lane for a red light. His was the first car in line and when the light turned green he turned left onto Cleveland Avenue. Thereafter, he was "undecided whether to make a right and go down by the hospital or whether to go straight through to South Cannon where there is no stop light." He had his right turn signal on but turned it off and continued down Cleveland Avenue. Getson stated that the car behind him at that time started around him and as he swung to the right to let him pass, his car "hit a rut because it was slippery." Thereafter two of his passengers got out and pushed his car back onto the road. He denied any contact with Elliott's car and asserted that the damages sustained by his car were caused by his running into a snowbank as Elliott passed him. According to Getson, the Elliott car pulled back into the right lane when about 45 feet in front of him and stopped. Getson pulled around Elliott's car, stopped and got out of his car. He was angry because of the fact that he wound up in a snowbank with his brand new car. "i was mad because he had cut in front of me." He went back to Elliott's car and "told him I had traveled 80 miles on icy roads and had traveled a good bit more on the ice than he had, and we had some words." Getson conceded that he assaulted Elliott, but denied that the assault was as extensive as described by Elliott.

In this factual posture the trial judge ruled, and we agree, that Jamestown Mutual was not liable to defend Getson in view of the exclusionary clause that "this policy does not apply * * * to bodily injury or property damage caused intentionally by or at the direction of the insured." Indeed, the appellants, in their brief submitted to this Court,

570

"concede that the language in the exclusion clause of Jamestown Mutual's policy was controlled in the situation that was described in the testimony and in fact the Appellants do not direct the thrust of this appeal to the ruling of the trial court declaring that Jamestown Mutual need not have to provide coverage for the actions of its insured, Getson. The policy language is clear and succinct and the evidence produced below would fall within the language of the policy."

The Elliotts urge, however, that the trial judge erred in ruling that the Unsatisfied Claim and Judgment Fund was not liable to pay any judgments which they might obtain against Getson as a result of his attack upon Mr. Elliott.[2]

The Unsatisfied Claim and Judgment Fund law applicable at the time the Elliotts made their claim is set forth in Md. Code, Art. 66½, §§ 7-601 through 7-635. It provides certain standards under which a qualified individual may make claim for the payment of a judgment and under which a judgment may be paid by the Fund.

Section 7-606 (a) provides that:

"Any qualified person, who suffers damages resulting from bodily injury or death or damage to property arising out of the ownership, maintenance, or use of a motor vehicle in this State * * * whose damages may be satisfied in whole or in part from the fund * * *,"

has the right to make a claim against the Fund for their payment upon meeting certain prescribed conditions.

Section 7-611 provides:

"When any qualified person * * * recovers a valid judgment * * * against any other person who was the operator or owner of a motor vehicle, for injury to, or death of, any person or persons * * * arising out of the ownership,

---

2. The separate tort action of Elliott v. Getson, No. 8486 — Law Docket #14, Circuit Court for Washington County, has apparently been held in abeyance pending the outcome of this declaratory judgment action.

> maintenance, or use of the motor vehicle in this State * * * [he may] apply to the court for an order directing payment of the fund, of the amount unpaid upon the judgment * * *."

The central issue, therefore, is whether the damages sustained by the Elliotts resulted from bodily injury "arising out of the ownership, maintenance, or use of a motor vehicle." That the Fund may be liable on a claim arising out of an intentional injury has been established. *Frazier v. Unsatisfied Claim and Judgment Fund Board,* 262 Md. 115. In fact, the Fund, in the brief submitted to this Court, states that it "does not contend that the Unsatisfied Claim and Judgment Fund law bars recovery for injuries intentionally inflicted through the use of an automobile, as would be grounds for denial of coverage in the normal insurance policy." It argues, however, that the assault and battery committed upon Elliott by Getson did not arise out of the ownership, maintenance, or use of a motor vehicle.

The Elliotts, on the other hand, concede that the incident did not arise out of the "maintenance" of a vehicle but argue "that the incident did in fact arise out of either the ownership of or the use of a vehicle because insofar as either element is concerned, the Appellant owned and/or was using his own vehicle at the time of the happening of the incident described in the evidence." It is true, as the appellants argue, that it is not necessary that damages be directly sustained or inflicted by the operation of a motor vehicle. In *National Indemnity v. Ewing,* 235 Md. 145, the Court of Appeals was called upon, in a declaratory judgment action, to construe a provision contained in an automobile liability policy providing that the insurer would pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile."

In that case the driver of an automobile, late at night, had run off the road into a snowbank and sheared off a utility pole. He and his passenger, who was riding in the back seat,

had previously been drinking at a local tavern. The passenger was apparently thrown out of the car into the snowbank at the time of the accident. The driver, after extricating his car from the snowbank, went back to help his passenger return to the car. While assisting his passenger, who was apparently uninjured but either "rung up or tired," walked across the road to re-enter the car, they were struck by an oncoming automobile. The jury found that the driver was negligent in running into the snowbank but that the passenger was not injured in that accident; that the driver of the oncoming car was negligent in striking them; that the driver running into the snowbank was guilty of concurrent negligence in the second accident; and that the passenger was not negligent. In disclaiming payment of the judgment obtained by the passenger against the driver helping him across the road, the driver's insurance company argued that there was no causal connection between the driver's first negligent action in running off the road into the snowbank, which did no injury to his passenger, and his action in negligently helping the passenger across the road in the face of an oncoming car. In reviewing this contention, the Court stated, at 150:

> "While we have found no case directly in point, we are constrained to agree with the trial court that a sufficient nexus was shown. At the time of the first accident the insured was using the covered vehicle to convey his friend, and himself, to Easton, and at the time of the second accident he was helping his friend back to the vehicle, from which he had been thrown by the negligence of the insured. * * * We think the ejection and recovery of Bridge [passenger] simply did not break the chain of use, any more than it would have been broken if Ewing [driver] had stopped to pick up a dropped article. In short, the negligent use of the car created a situation where Bridge was subjected to the risk of injury * * *."

The Court quoted with approval the following language

from *Merchants Company v. Harford Accident and Indemnity Company*, 188 So. 571, 572 (Miss. 1939):

"Our conclusion, under a policy such as is here before us, is that where a dangerous situation causing injury is one which arose out of or had its source in, the use or operation of the automobile, the chain of responsibility must be deemed to possess the requisite articulation with the use or operation until broken by the intervention of some event which has no direct or substantial relation to the use or operation, — which is to say, that the event which breaks the chain, and which, therefore, would exclude liability under the automobile policy, must be an event which bears no direct or substantial relation to the use or operation * * *."

We think this is a sound statement of the law. It is true that the Court there was construing a provision in an automobile insurance policy and we are aware that the Court of Appeals has stated that judicial interpretations of automobile insurance policies are not necessarily controlling in cases under the Unsatisfied Claim and Judgment Fund law. *Frazier v. Unsatisfied Claim and Judgment Fund Board, supra*, 118. Nevertheless, we think the principle expressed in *Merchants* is equally applicable to the provisions contained in the Unsatisfied Claim and Judgment Fund Act. In our opinion, the chain of responsibility attendant the ownership or use of the Elliott vehicle and the Getson vehicle was completely broken by the intervention of the assault and battery committed upon Elliott by Getson. The proximate cause of Elliott's injuries was not the negligent use of an automobile but the brutal beating he received at the hands of Getson. Otherwise stated, there has been no showing of "a sufficient nexus" between the ownership or use of either vehicle and the injuries sustained by Elliott to warrant holding the Fund liable for the payment of any judgments the Elliotts might obtain against Getson for the injuries inflicted.

The break in the sequence of events is no less clear

because it took place in a matter of minutes, or even seconds, rather than hours or days. It may be argued that it was the use by Elliott of *his* motor vehicle which induced in Getson, with or without justification, a rage of apparently uncontrollable temper and a desire to inflict personal violence upon the object of his anger. It may even be argued that Getson's use of *his own* motor vehicle caused or contributed to his anger. But anger, no matter how induced, does not justify in law a physical attack by one person upon another in the absence of a valid showing of self defense. Under the circumstances shown here, there simply is no relationship recognizable in law, between Getson's use of his motor vehicle and the battery he later committed upon Elliott.

We are not persuaded that the holding of the Court of Appeals in *Frazier v. Unsatisfied Claim and Judgment Fund Board, supra,* compels a different conclusion. In *Frazier* a mother was driving her Chevrolet convertible on the evening of July Fourth, with her five-year old son a passenger in the rear seat of the open car. According to the mother, an unidentified car, going in the opposite direction, passed her and as it did, the driver of the car threw a lighted firecracker or cherry bomb into the rear seat of her car. Distracted by the explosion and by her son's cries, she lost control of her car and hit a tree. Both she and the son were injured. The mother and her husband filed petitions in the Circuit Court for Anne Arundel County in which they sought leave to sue the Unsatisfied Claim and Judgment Fund Board. From an order denying their petition, they appealed. The court below concluded, "as a matter of law," that the injuries sustained did not "arise out of the ownership, maintenance, and use of the unidentified car." The Court of Appeals reversed, stating at 117 and 119:

> "The question, of course, is whether the Fraziers' injuries arose 'out of the ownership, maintenance or use of a motor vehicle.'

* * *

"We conclude that for purposes of determining whether leave to sue the Board should have been granted, the injuries under the facts of this case did arise out of the ownership, operation or use of an unidentified motor vehicle."

While arguably there is an analogy between *Frazier* and the case before us, there is a real distinction in that although the loss of control of the Frazier's car was caused by the thrown cherry bomb, the injuries that they directly and actually received were caused by the car striking a tree. In any event, we think the Court in *Frazier*, on the unique factual posture of that case, intended to reach the outer limits of the Fund's responsibility under the statute and we are not prepared to extend the Fund's liability beyond those limits which, in our opinion, a contrary holding here would accomplish. In reaching this conclusion, we are very much aware of the admonition of the Court of Appeals that the statute is remedial in nature and should be liberally construed. *Frazier v. Unsatisfied Claim and Judgment Fund Board, supra*, at 118; *Maddy v. Jones*, 230 Md. 172, 179. We think, however, that any other holding than the one we have reached would constitute a misreading of the statute and would subject the Fund to liabilities which the General Assembly of Maryland never intended it to have.

*Judgment affirmed; costs to be paid by appellants.*

*Lowe, J., concurring and dissenting:*

In light of the exclusionary clause in the Jamestown policy, I fully concur that Jamestown was not liable to defend Getson. What responsibility Jamestown had ran only to its insured by virtue of that contract between them.

I cannot agree, however, that similar reasoning should be applied to the responsibility of the Unsatisfied Claim and Judgment Fund to the Elliotts. The Fund was never intended as a substitute insurer protecting a tort-feasor (Getson) against liability. Rather, it had the public purpose

of providing *some* compensation to an injured party (Elliott) when a motor vehicle tort-feasor was neither financially responsible nor insured against liability, for motor vehicle torts. The Fund is more akin to the Criminal Injuries Compensation Act in purpose than to an insurance contract. While looking for guidance in cases interpreting insurance contracts, the majority acknowledge that the Court of Appeals was most hesitant to do so in *Frazier v. Unsatisfied Claim and Judgment Fund Board*, 262 Md. 115. Speaking for the Court in *Frazier*, Judge Singley stated, at 118:

> "We are reluctant to accept the notion that the gloss of judicial interpretation which may surround the provisions of the standard automobile insurance policy should necessarily be controlling in cases under our Unsatisfied Claim and Judgment Fund Law. We have noted that the Act is remedial in character, *Maddy v. Jones*, 230 Md. 172, 179, 186 A. 2d 482 (1962) and must be liberally construed, and while due regard must be given to the protection of the Fund, *Wheeler v. Unsatisfied Claim & Judgment Fund*, 259 Md. 232, 239, 269 A. 2d 593 (1970); *Hawks v. Gottschall*, 241 Md. 147, 215 A. 2d 745 (1966), in the interest of protecting the innocent victims whom the Act was intended to benefit, we are disposed to consider, but not necessarily to be bound by, decisions involving the interpretation of insurance contracts."

I find *Frazier* more apposite and far more persuasive than the language from a 1939 Mississippi case quoted by the Court of Appeals while interpreting the language of a contract of insurance coverage relied upon by the majority, *National Indemnity v. Erving*, 235 Md. 145.

In *Frazier* a mother was driving her Chevrolet convertible on the evening of July Fourth, with her five-year old son a passenger in the rear seat of the open car. According to the mother, an unidentified car, going in the opposite direction, passed her and as it did, the driver of the car threw a lighted firecracker or cherry bomb into the rear seat of her car.

Distracted by the explosion and by her son's cries, she lost control of her car and hit a tree. Both she and the son were injured. The mother and her husband filed petitions in the Circuit Court for Anne Arundel County in which they sought leave to sue the Unsatisfied Claim and Judgment Fund Board. From an order denying their petition, they appealed. The court below concluded, "as a matter of law," that the injuries sustained did not "arise out of the ownership, maintenance, and use of the unidentified car." The Court of Appeals reversed, stating at 117 and 119:

> "The question, of course, is whether the Fraziers' injuries arose 'out of the ownership, maintenance or use of a motor vehicle.'
>
>         * * *
>
> We conclude that for purposes of determining whether leave to sue the Board should have been granted, the injuries under the facts of this case did arise out of the ownership, operation or use of an unidentified motor vehicle."

I can see little difference between the Fund being liable for the action of a passing motorist throwing a cherry bomb or firecracker into a victim's car and being liable for the action of a passing motorist who stops his car, jumps out and forcefully throws himself into the victim's car with the avowed purpose of doing injury to the driver of the car he has just passed and whose passage he has just blocked, which injury is done without the victim having ever been fully extracted therefrom.

The majority's heavy reliance upon *Merchants Company v. Hartford Accident and Indemnity Company*, 188 So. 571 (Miss. 1939) is misplaced. The excerpt from that case found so significant by the majority is:

> "Our conclusion, under a policy such as is here before us, is that where a dangerous situation causing injury is one which arose out of or had its source in, the use or operation of the automobile,

> the chain of responsibility must be deemed to possess the requisite articulation with the use or operation until broken by the intervention of some event which has no direct or substantial relation to the use or operation, — which is to say, that the event which breaks the chain, and which, therefore, would exclude liability under the automobile policy, must be an event which bears no direct or substantial relation to the use or operation; and until an event of the latter nature transpires the liability under the policy exists."

I cannot subscribe to the argument that the event which broke the chain of use of the Getson automobile was his stopping the automobile and then assaulting Elliott. The attack upon Elliott was obviously made in "hot blood" occasioned by the use or misuse of one or both vehicles. In a sense, a fight began between Elliott and Getson with the combatants using automobiles as weapons. It culminated with Getson leaping from his automobile into the automobile of Elliott and there finishing the battle. It was all part of one and the same transaction.

Thus, I am of the opinion that the facts to be developed at a trial on the merits could take such a posture that the trier of facts could well find that Elliott suffered at the hands of Getson "damages resulting from bodily injury . . . arising out of the ownership, maintenance, or use of a motor vehicle . . . ." If the Legislature had intended an exclusion for intentional torts such as the exclusionary clause under which Jamestown was released, the Legislature would have provided for such exclusion.

While concededly the issue here is a close one, I am persuaded we should have resolved it against the Fund at this stage of the proceedings in view of the admonition of the Court of Appeals that the statute is remedial in nature and should be liberally construed — not on behalf of the tort-feasor, but on behalf of the injured party. *Frazier v. Unsatisfied Claim and Judgment Fund Board, supra,* 262 Md. at 118; *Maddy v. Jones,* 230 Md. 172, 179.

I respectfully dissent.